1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| LOUIS BERYL,<br><br>    Plaintiff,<br><br>v.<br><br>NAVIENT CORPORATION, et al.,<br><br>    Defendants. | Case No. 20-cv-05920-LB<br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW** |

**INTRODUCTION**

Plaintiff Louis Beryl started an online student-lending company called Earnest, Inc. Defendant

Navient Corporation — which services and collects private and federal student loans through its

subsidiary Navient Solutions LLC — acquired Earnest, Inc. for approximately $155 million and

hired Mr. Beryl and his team to run a new Navient Corporation entity called Earnest LLC. After

several months, Navient fired Mr. Beryl, who sued Navient for (1) severance pay due to him under

an executive-severance plan, in violation of ERISA § 502(a)(1)(B), (2) breach of fiduciary duties

for the denial of benefits, in violation of ERISA § 502(a)(3), (3) breach of his employment contract,

and (4) waiting-time penalties under the California Labor Code. A jury trial on the breach-of-

contract claim (against defendants Navient Corporation, Navient Solutions, and Earnest LLC)

resulted in a verdict in Mr. Beryl's favor. Claims one and two (against Navient Corporation and the

Navient Corporation Executive Severance Plan for Senior Officers (the Plan)) are governed by

United States District Court
Northern District of California

1    ERISA, 29 U.S.C. §§ 1001–1461. The court held a bench trial (at the same time as the jury trial)

2    under Rule 52 on the ERISA claims and the claim for waiting-time penalties under the California

3    Labor Code. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir. 1999).[1] Based on the

4    evidence at trial and jury findings that bind the court, Navient Corporation wrongfully failed to pay

5    Mr. Beryl his severance benefits and waiting-time penalties: $800,000 (salary and annual bonus of

6    $400,000 each and a multiplier of one), $33,333 (the target bonus for 2018),[2] $54,000 (the eighteen-

7    month value of lost medical, dental, and vision benefits), and $33,333.33 in waiting-time penalties

8    under California Labor § 203. The total is $920,666.33.

## FINDINGS OF FACT

The parties stipulated to the following facts.[3]

1.   In 2013, Mr. Beryl co-founded an online student lending company called Earnest, Inc.

2.   In November 2017, Navient Corp. acquired Earnest, Inc. for approximately $155 million.

3.   Navient Solutions LLC services and collects existing private and federal student loans.

4.   Navient Corp. formed Earnest LLC, which is located in San Francisco.

5.   Navient Corp. entered into a written employment agreement with Mr. Beryl (the Employment Agreement) on October 4, 2017. The Employment Agreement is Trial Exhibit 1.[4]

6.   "The Employment Agreement provided that Mr. Beryl would have the corporate title of Senior Vice President of Navient Solutions, LLC ('NSL') and the CEO of Earnest LLC."[5]

7.   The Employment Agreement provided that Mr. Beryl would "report to Tim Hynes[], Navient's Executive Vice President, Consumer Lending."[6]

---

[1] Compl. – ECF No. 1 (all claims); Jury Instrs. – ECF No. 81 at 9–13 (only the breach-of-contract claim was tried to the jury); Verdict – ECF No. 88 (same); Pl.'s Opening Arg. – ECF No. 96 at 5, 7–15 (claims tried in the bench trial). Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] This amount is undisputed. Mot. – ECF No. 96 at 11; Opp'n – ECF No. 100 at 11.

[3] Joint Stipulated Facts – ECF No. 49-8 at 2–3 (nos. 1–19).

[4] Trial Ex. 1 – ECF 100-1 at 4–18 (Navient-LB 000393–000407).

[5] *Id.* at 4 (Navient-LB 000393).

[6] *Id.*

8.  The Employment Agreement provided that Mr. Beryl would be paid a base salary at the rate of $300,000 per year.[7]

9.  The Employment Agreement provided that Mr. Beryl would be "eligible to participate in the Navient Corporation Executive Severance Plan for Senior Officers [the "Severance Plan"]." The Severance Plan is Trial Exhibit 17.[8]

10. The Severance Plan is governed by ERISA.

11. The Severance Plan provides, in part, that upon termination "without cause," "an Eligible Officer will be entitled to receive a severance payment ('Severance Payment') and continuation of medical, dental and vision insurance benefits and outplacement services, all as provided herein. . . ."[9]

12. Mr. Beryl was an "Eligible Officer" per the terms of the Severance Plan.[10]

13. The Severance Plan entitled Mr. Beryl to certain severance payments if Navient Corp. decided to terminate his employment "without cause."[11]

14. The Severance Plan defines "For Cause" (and the jury was instructed with that definition):

> **2.04. "For Cause"** means a determination by the Committee (as defined herein) that there has been a willful and continuing failure of an Eligible Officer to perform substantially his duties and responsibilities (other than as a result of Eligible Officer's death or Disability) and, if in the judgment of the Committee such willful and continuing failure may be cured by an Eligible Officer, that such failure has not been cured by an Eligible Officer within ten (10) business days after written notice of such was given to Eligible Officer by the Committee, or that Eligible Officer has committed an act of Misconduct (as defined below). For purposes of this Plan, "Misconduct" means: (a) embezzlement, fraud, conviction of a felony crime, pleading guilty or nolo contendere to a felony crime, or breach of fiduciary duty or deliberate disregard of the Corporation's Code of Business Code; (b) personal dishonesty of Eligible Officer materially injurious to the Corporation; (c) an unauthorized disclosure of any Proprietary Information; or (d) competing with the Corporation while employed by the Corporation or during the Restricted Period, in

---

[7] *Id.*

[8] *Id.* at 5 (Navient-LB 000394); Trial Ex. 17 – ECF No. 100-1 at 24–42 (pp. 1–18, Navient-LB 000444–000461).

[9] Trial Ex. 17, § 3.02 – ECF No. 100-1 at 27–28 (pp. 3–4, Navient-LB 000444–000445).

[10] *Id.* § 3.01 – ECF No. 100-1 at 27 (Navient-LB 000446).

[11] *Id.* § 3.02 – ECF No. 100-1 at 27–28 (pp. 3–4, Navient-LB 000444–000445).

contravention of the non-competition and non-solicitation agreements substantially in the form provided in Exhibit C upon termination of employment.[12]

15. The Severance Plan provided that, if Mr. Beryl were to be terminated without cause, he would be entitled to continue to participate in any medical, dental, and vision insurance plans generally available to the senior management of Navient Corp. "[f]or eighteen (18) months (or twenty-four (24) months if the Eligible Officer is the Chief Executive Officer) following the Eligible Officer's Termination Date."[13]

16. Navient Corp. terminated Mr. Beryl's employment on January 24, 2018.

17. When Navient Corp. informed Mr. Beryl of the termination of his employment, it told him that he would not receive severance benefits because Navient Corp. believed that it had cause to terminate Mr. Beryl's employment.

18. Mr. Beryl made a claim for benefits pursuant to the Severance Plan on March 13, 2018.

19. Navient Corp. denied Mr. Beryl's claim for benefits under the Severance Plan on June 7, 2018.

The parties agreed that the jury's fact findings bind the court:[14]

    1. Did Navient have cause to terminate Mr. Beryl's employment?

      Answer: No

. . .

    3. Did Navient and Mr. Beryl agree that Mr. Beryl's annual base salary would be increased from $300,000.00 to $400,000.00?

    Answer: Yes

---

[12] *Id.* § 2.04 – ECF No. 100-1 at 26 (p. 2, Navient-LB 000445); Jury Instr. – ECF No. 81 at 13.

[13] *Id.* § 3.02(c) – ECF No. 100-1 at 28 (p. 4, Navient-LB 000447).

[14] Joint Submission Regarding Trial of ERISA Claims – ECF No. 65 at 3; Verdict – ECF No. 88 at 1–2.

1

4. Did Navient and Mr. Beryl agree that Mr. Beryl's annual bonus amount would be increased from 75% of his annual base salary to 100% of his annual base salary?

2

Answer: Yes

3

4

The Plan defines those eligible for benefits under it: "**3.01. Eligible Officers**. Officers of

5

Navient Corporation and its wholly owned subsidiaries with the corporate title of Senior Vice

6

President or above are eligible for benefits under this Plan. . . ."[15]

7

Mr. Beryl's employment agreement said, "On behalf of E Parent, Inc.[], as the anticipated

8

controlling shareholder of Earnest, Inc.[], I am pleased to offer you continued employment, under

9

revised terms, as Chief Executive Officer of Earnest located in San Francisco, California. You will

10

have the corporate title of Senior Vice President of Navient Solutions, LLC (together with Navient

11

Corporation, its parent and the parent of E Parent, hereafter 'Navient'), and you will report to Tim

12

Hynes, Navient's Executive Vice President, Consumer Lending."[16] "Additionally, you will be

13

eligible to participate in the Navient Corporation Executive Severance Plan for Senior Officers. . . ."[17]

14

The Plan defines average bonus:

15

**2.01 "Average Bonus"** means the annualized performance bonus compensation calculated under this Plan for the rolling 24-month period immediately prior to the Eligible Officer's Termination Date, including as a full month the month during which the Termination Date occurs. Only bonuses paid or payable under the Corporation's annual management incentive plan will be used for purposes of calculating Average Bonus under this Plan; any other bonus payments will be disregarded. An example of a calculation of the Average Bonus portion of a Severance Payment according to the Plan is attached hereto as Exhibit A. For purposes of calculating Average Bonus under the Plan for the current fiscal year, the Eligible Officer's base salary and target bonus at the Termination Date will be used and the Corporate performance scores from all completed quarters during the relevant portion of the fiscal year will be used. Notwithstanding anything to the contrary herein, if an Eligible Officer has fewer than 24 months of employment with the Corporation as of his or her Termination Date, then "Average Bonus" means the annualized performance bonus compensation calculated as described above but prorated for the portion of the rolling 24 month period that is represented by the time from the Eligible Officer's date of hire to the Eligible Officer's Termination Date.

16

17

18

19

20

21

22

23

24

25

---

26

[15] Trial Ex. 17, § 3.01 – ECF No. 100-1 at 27 (p. 3, Navient-LB 000446).

27

[16] Trial Ex. 1 – ECF No. 100-1 at 4 (Navient-LB 000393).

28

[17] *Id.* at 5 (Navient-LB 00394).

An example of a calculation of the Average Bonus portion of a Severance Payment according to the previous sentence is attached hereto as Exhibit B. An Eligible Officer who was employed by SLM Corporation or its affiliates on April 30, 2014, and who has been continuously employed by the Corporation or its affiliates from and after April 30, 2014, shall have his service as an employee of SLM Corporation or its affiliates, and any performance bonus compensation paid during that period of service, included for purposes of this Section 2.01.[18]

Mr. Beryl's employment agreement said the following about his average bonus:

For purposes of the Navient Corporation Executive Severance Plan for Senior Officers, your "Average Bonus" shall equal your target annual incentive bonus until you have been paid an annual incentive bonus with respect to 2017 and, after such time, your "Average Bonus" shall be determined in accordance with the plan.[19]

. . .

You will be eligible to receive an annual incentive bonus equal to 75% of your annual base salary [increased, as the jury verdict shows, to 100%], based on achievement of measurable specific performance goals determined by Navient in good faith, after consultation with you, pursuant to an incentive plan established by Navient in its discretion. This bonus will have a maximum upside of 50% tied to exceptional goal achievement, for a maximum potential payout equal to 112.5% of your annual base salary. Bonus amounts will be paid in a single lump-sum within two and one-half months following the close of Navient's fiscal year to which the bonus relates. For the 2017 calendar year, your bonus amount will be prorated based on the number of calendar days in 2017 following the Closing Date [defined elsewhere in the agreement as the Closing Date defined in the Merger Agreement between Navient and Earnest Inc.].[20]

In February 2018, Navient paid Mr. Beryl a bonus of $37,500 for calendar year 2017.[21]

The Plan's provision about severance benefits is as follows:

**3.02 Severance Benefits**. (a) An Eligible Officer will be entitled to receive a severance payment ("Severance Payment") and continuation of medical, dental and vision insurance benefits and outplacement services, all as provide herein, after any of the following events[:] . . .  (II) upon a Termination of Eligible Officer's Employment Without Cause. . . .

(b) The amount of the Severance Payment will equal the sum of the Eligible Officer's Base Salary plus the Eligible Officer's Average Bonus times a multiplier plus a cash payment equal to the Eligible Officer's target annual bonus amount for the year in

---

[18] Trial Ex. 17, § 2.01 – ECF No. 100-1 at 25–26 (pp. 1–2, Navient-LB 000444–000445).

[19] Trial Ex. 1 – ECF No. 100-1 at 5 (Navient-LB 000394).

[20] *Id.* at 100-1 at 5–6 (Navient-LB 000394–000395) (definition of annual incentive bonus), 4 (Navient-LB 000393) (definition of Closing Date).

[21] Trial Ex. 37 – ECF No. 100-1 at 21 (Navient-LB 000248).

United States District Court
Northern District of California

which the Termination Date occurs, such target bonus amount to be prorated for the full number of months in the final year that the Eligible Officer was employed by [Navient]. The multiplier for Eligible Officers with the title of Chief Executive Officer will be two (2). The multiplier for all other Eligible Officers will be one (1).

(c) For eighteen (18) months (or twenty-four (24) months if the Eligible Officer is the Chief Executive Officer) following the Eligible Officer's Termination Date, the Eligible Officer and his or her eligible dependents or survivors will be entitled to continue to participate in any medical, dental and vision insurance plans generally available to the senior management of the Corporation. . .; provided that if the Corporation determines it cannot provide such continued coverage without potentially violating applicable law, the Corporation shall in lieu thereof provide to the Eligible Officer a taxable monthly payment in an amount equal to the portion of the monthly premium that the Corporation would otherwise be required to pay under this Section 3.02(c) to continue the Eligible Officer's coverage by such medical, dental and vision benefit plans (based on the premium for the first month of coverage following the Eligible Officer's Termination Date), which payment will commence in the month following the month in which the Eligible Officer's Termination Date occurs and end on the final day of the applicable continuation period described in this Section 3.02(c). An Eligible Officer and his or her eligible dependents will cease to be covered under the foregoing medical, dental and/or vision insurance plans (or, if taxable medical payments are being provided as described above, will cease to receive such payments) if he or she becomes eligible to obtain coverage under medical, dental and/or vision insurance plans of a subsequent employer.[22]

Mr. Beryl testified at trial that the cash value of his medical, dental, and vision benefits following his wrongful termination was $72,000 (based on twenty-four months of coverage under the Severance Plan for a CEO).[23] The testimony was undisputed. The court finds that the cash value for twenty-four months is $72,000, which is $3,000 per month. If the term of coverage is eighteen months, the total value is $54,000.

The Plan has an integration clause: "**6.09. <u>Whole Agreement</u>**. This Plan contains all the legally binding understandings and agreements between the Eligible Officer and the Corporation pertaining to the subject matter thereof and supersedes all such agreements, whether oral or in writing, previously entered into between the parties."[24] It also has a provision about the effect of employment contracts: "**1.03. <u>Employment Contracts Govern</u>**. . . . To the extent that an Eligible

---

[22] Trial Ex. 17, § 3.02 – ECF 100-1 at 27–28 (pp. 3–4, Navient-LB 000446–000447).

[23] This amount is undisputed. Mot. – ECF No. 96 at 10; Opp'n – ECF No. 100 at 14 (accepting amount).

[24] Trial Ex. 17, § 6.09 – ECF No. 100-1 at 32 (p. 8, Navient-LB 000451).

United States District Court
Northern District of California

Officer is party to an employment or other Contract or agreement that provides for any severance payments upon such Eligible Officer's termination of employment with the Corporation or any of its subsidiaries, then that contract or agreement governs, and not this Plan. Upon expiration of such contract or agreement, this Plan will govern."[25]

The decision to terminate Mr. Beryl is reflected in the Navient Corporation Employee Benefits Fiduciary Committee's meeting minutes on January 23, 2018. The minutes set forth the Severance Plan's "for cause" provision (see supra) and recounts the grounds for the Committee's decision:

> Mr. Hynes explained that he is the direct supervisor of Mr. Beryl. He then recounted his interactions with Mr. Beryl since Navient's acquisition of Earnest in November 2017, noting that Mr. Beryl had spent significant time and resources attempting to renegotiate his personal compensation and the financial targets established for . . . Earnest, both of which had been agreed upon in connection with and prior to the acquisition. He noted that during this time, Mr. Beryl repeatedly missed deadlines for providing a detailed 2018 business plan for Earnest. Finally, Mr. Hynes explained that Mr. Beryl to-date had not provided a detailed 2018 business plan for Earnest, and that Mr. Hynes intended to terminate Mr. Beryl's employment.
>
> Mr. Hynes responded to various questions from the Committee regarding Mr. Beryl's actions. Following a discussion, the Committee determined that (i) Mr. Beryl's actions (including his failure to act) constitute a willful and continuing failure to substantially perform his duties and responsibilities as Chief Executive Officer of Earnest, and that (ii) such actions (or failure to act) are not curable. Therefore, the committee determined that a termination of Mr. Beryl's employment would constitute a termination "For Cause" within the meaning of the Plan.[26]

Navient's theory at trial was that Mr. Beryl's talents made him a great founder of his startup corporation Earnest Inc. but did not translate at Navient in three ways: (1) he did not provide budget plans on time by November 2017, and his draft plans had had unsatisfactory projections of loss; (2) when he finally produced an acceptable plan on January 22, 2018, he badmouthed it; and (3) he renegotiated his salary and his non-compete agreement.[27] As to (1) and (2), the evidence

---

[25] Id., § 1.03 – ECF No. 100-1 at 25 (Navient-LB 000444).

[26] Trial Ex. 9 at 1 (Navient-LB 000462).

[27] Defs.' Closing Arg., RT 10/28/2022 at 742:14–753:20; Trial Ex. 25 (Navient-LB 000555–56) (11/28/2017 email from Tim Hynes to Jack Remondi about Mr. Beryl's renegotiation of deal); Hynes Test., RT 10/28/22 at 613:3–614:1 (timeline for budget plan was end of November 2017), 614:4–615:21 (disagreed with Mr. Beryl that budget required months of work), 616:7–618:10 (Mr. Beryl's renegotiation of his compensation was unusual and a headache), 631:13–646:4 (Mr. Beryl sent a series

United States District Court
Northern District of California

showed that Mr. Beryl and his team worked very hard to deliver budget plans, putting in long days over the holidays during a time when his wife gave birth.[28] No evidence suggested willfulness on his part. There were no emails or communications about any deadlines. There was no notice, no warning, and no opportunity to address any failure. Navient acknowledged that Mr. Beryl's budgets were comprehensive.[29] In fact, Navient adopted the numbers in Mr. Beryl's January 22 plan and exceeded its budget by at least $10 million, proving Mr. Beryl right.[30]

As to (3), there was no evidence — except for Mr. Hynes's testimony that it was a headache — that Mr. Beryl failed to perform his responsibilities by renegotiating his compensation package. Navient did not disclose before the acquisition that Mr. Beryl and his team would have to shoulder additional expenses that they did not have before the acquisition.[31] Mr. Beryl negotiated better compensation packages for his team, not just himself, and Navient agreed to them in January 2018.[32]

## CONCLUSIONS OF LAW

The plaintiff has two ERISA claims: (1) wrongful denial of benefits under ERISA § 502(a)(1)(B) and (2) breach of fiduciary duty under ERISA § 502(a)(3). He also claims waiting-time penalties under California Labor Code § 203.[33]

Section 502(a)(3) "is a 'catchall' provision which provides relief only for injuries that are not otherwise adequately provided for." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1475 (9th Cir. 1997), *aff'd*, 525 U.S. 299 (1999), *and overruled on other grounds by Lacey v. Maricopa Cnty.*,

---

of unacceptable budgets in November, December, and January), 646:5–648:3 (Mr. Beryl sent an acceptable plan on January 22, 2018), 647:9–648:20 (Mr. Beryl and his team did not think that the January 22 plan was achievable); Trial. Ex. 16 (Navient-LB 000717–22) (Beryl email forwarding January 22 plan with his recommendations).

[28] *See, e.g.*, Trial Ex. 16 (Navient-LB 000717–22).

[29] Hynes Test., RT 10/28/22 at 678:11–679:2 (no notice or warnings), 706:6–17 (no emails about the timeframe), 708:23–709:7 (comprehensive); Beryl Test., RT 10/25/22 at 61:17–21, 70:13–107:17.

[30] Hynes Test., RT 10/28/22 at 696:19–698:3 (Mr. Hynes adopted Mr. Beryl's numbers on January 30, 2018), 698:4–9 (over budget); Trial. Ex. 35 (Hynes plan).

[31] *Id.* at 681:9–683:6.

[32] Hynes Test., RT 10/28/22 at 616:7–618:10; Beryl Test., RT 10/25/22 at 61:17–21, 70:13–73:25.

[33] Compl. – ECF No. 1 at 11–12 (¶¶ 44–56).

693 F.3d 896 (9th Cir. 2012). And "equitable relief under section 1132(a)(3) [ERISA § 502(a)(3)] is not 'appropriate'" when ERISA § 502(a)(1)(B) provides an adequate remedy. *Id.* at 1475. Thus, the court addresses the plaintiff's claim under § 502(a)(1)(B) first, then his claim under § 502(a)(3), and finally his claim to waiting-time penalties under California Labor § 203. The court concludes that Navient wrongfully failed to pay Mr. Beryl the following amounts: (1) under the Severance Plan, $800,000 (based on a salary and annual bonus of $400,000 each and a multiplier of one), $33,333 for the target bonus for 2018,[34] and $54,000 (the eighteen-month value of lost medical, dental, and vision benefits), and (2) $33,333.33 in waiting-time penalties under California Labor § 203. The total is $920,666.33.

Section 502 of ERISA provides that a plan beneficiary may sue in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); *Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004) (ERISA § 502(a)(1)(B) "is relatively straightforward. If a participant or beneficiary believes that benefits promised to him under the terms of the plan are not provided, he can bring suit seeking provision of those benefits."). When evaluating a claim that a plan administrator improperly denied benefits under an ERISA plan, the court applies "a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 629 (9th Cir. 2009) (same). "If the plan confers such discretion, then the denial is reviewed for an abuse of discretion." *Wise v. MAXIMUS Fed. Servs., Inc.*, 478 F. Supp. 3d 873, 877 (N.D. Cal. 2020) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 110–11 (2008)).

When the court reviews a decision for abuse of discretion, the standard applies based on whether the plan administrator had a conflict of interest. *Montour*, 588 F.3d at 629. There is often a conflict of interest because the entity that funds an ERISA benefits plan also is often the entity

---

[34] This amount is undisputed. Mot. – ECF No. 96 at 11; Opp'n – ECF No. 100 at 11.

evaluating the claim. *Id.* at 630. If there is no conflict, the court applies the usual abuse-of-discretion standard. *Id.* at 629. But if there is a conflict, "the court must consider numerous case-specific factors, including the administrator's conflict of interest, and reach a decision as to whether discretion has been abused by weighing and balancing those factors together." *Id.* at 630.

Applying the de novo standard of review is more straightforward because no analysis of possible conflict of interest is required, and "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits, without reference to whether the administrator operated under a conflict of interest." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).

The parties agreed that the court's review of the plan administrator's decision is de novo.[35] *See Rorabaugh v. Cont'l Cas. Co.*, 321 F. App'x 708, 709 (9th Cir. 2009) ("Defendants waived their right to appeal the district court's choice of the *de novo* standard of review by filing a stipulation to the standard and reiterating the stipulation in their trial memorandum.").

The court considers the parties' arguments under Federal Rule of Civil Procedure 52. Rule 52(a)(1) provides that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record . . . or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58." In doing so, the court does not determine whether there is an issue of material fact but instead "evaluate[s] the persuasiveness of conflicting testimony" and makes findings of fact. *Kearney*, 175 F.3d at 1095. This trial is a "bench trial on the record," which may "consist[] of no more than the trial judge rereading [the administrative record]." *Id.*

Another issue is the burden of proof. "In an ERISA case that involves *de novo* review, the general rule is that the plaintiff bears the burden of demonstrating that a benefit is covered." *Wise*, 478 F. Supp. 3d at 887 (citing *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010)). In general, ERISA plans should be enforced as written. *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 100 (2013). But, when the issue is the exclusion of coverage under

---

[35] Joint Submission Regarding Trial of ERISA Claims – ECF No. 65 at 2.

an ERISA-governed plan, the defendant has the burden to show that the exclusion applies. *Wise*, 478 F. Supp. 3d at 886 (citing *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1557 (9th Cir. 1991) ("In insurance litigation, while the burden is on the insurer to prove a claim covered falls within an exclusion, the burden is on the insured initially to prove that an event is a claim within the scope of the basic coverage.") (cleaned up)). The specific burden of proof is the preponderance of the evidence and "[u]nder general principles of insurance law, exclusions are construed narrowly." *Id.* (quoting *Dowdy v. Metro. Life Ins. Co.*, 890 F.3d 802, 810 (9th Cir. 2018)).

Thus, to justify its reliance on the for-cause exclusion, the defendant's burden is to show by a preponderance of the evidence that it terminated the plaintiff "For Cause" under the terms of the Plan. The parties agree that the jury's finding — that Navient did not have cause to fire Mr. Beryl — binds the court.[36] Mr. Beryl thus is entitled to severance benefits under the Plan. The three issues about the entitlement to benefits under the Plan are the amount of the bonus, the multiplier that applies, and lost medical, dental, and vision benefits. The fourth issue is the entitlement to waiting-time penalties under the California Labor Code.

### 1. Bonus Amount

Mr. Beryl's employment agreement defined his average bonus under the Severance Plan:

> For purposes of the Navient Corporation Executive Severance Plan for Senior Officers, your "Average Bonus" shall equal your target annual incentive bonus until you have been paid an annual incentive bonus with respect to 2017 and, after such time, your "Average Bonus" shall be determined in accordance with the plan.[37]

The Severance Plan has an integration clause,[38] but it also provides that if an eligible officer has an employment contract that provides for severance payments, that contract governs.[39]

---

[36] *Id.* at 3.

[37] Trial Ex. 1 – ECF No. 100-1 at 5 (Navient-LB 000394).

[38] Trial Ex. 17, § 6.09 – ECF No. 100-1 at 32 (p. 8, Navient-LB 000451).

[39] *Id.*, § 1.03 – ECF No. 100-1 at 25 (Navient-LB 000444).

As discussed in the Statement, when Mr. Beryl was fired on January 24, 2018, he had not been paid his 2017 bonus.[40] Under the plain language of the employment agreement, his "Average Bonus" under the Severance Plan thus was his target annual incentive bonus. The jury found that his annual base salary was $400,000 and his annual bonus amount was 100 percent of his base salary.[41] The bonus thus is $400,000.

**2. Multiplier**

The issue is whether Mr. Beryl is entitled to a multiplier on his severance payment of one or two. Because his corporate title was Senior Vice President of Navient Solutions, the multiplier is one.

The Plan defines those eligible for benefits under the plan: "**3.01. Eligible Officers**. Officers of Navient Corporation and its wholly owned subsidiaries with the corporate title of Senior Vice President or above' are eligible for benefits under this Plan. . . ."[42] It provides for a multiplier based on the Eligible Officer's title: "The multiplier for Eligible Officers with the title of Chief Executive Officer will be two (2). The multiplier for all other Eligible Officers will be one (1)."[43]

Mr. Beryl's job title is in his employment agreement: "On behalf of E Parent, Inc.[], as the anticipated controlling shareholder of Earnest, Inc.[], I am pleased to offer you continued employment, under revised terms, as Chief Executive Officer of Earnest located in San Francisco, California. You will have the corporate title of Senior Vice President of Navient Solutions, LLC (together with Navient Corporation, its parent and the parent of E Parent, hereafter 'Navient'), and you will report to Tim Hynes, Navient's Executive Vice President, Consumer Lending."[44]

Mr. Beryl's corporate title — the title that makes him an Eligible Officer under the Severance Plan — is Senior Vice President of Navient Solutions. The ordinary understanding of the Plan terms governing the multiplier — given the Plan definitions — is that a person with that title

---

[40] Trial Ex. 37 – ECF No. 100-1 at 21 (Navient-LB 000248) (bonus paid in February 2018).

[41] Verdict – ECF No. 88 at 1–2.

[42] Trial Ex. 17, § 3.01 – ECF No. 100-1 at 27 (p. 3, Navient-LB 000446).

[43] *Id.*, § 3.02(b) – ECF No. 100-1 at 27 (p. 3, Navient-LB 000446).

[44] Trial Ex. 1 – ECF No. 100-1 at 4 (Navient-LB 000393).

1    receives a multiplier of one, not two. *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1194 (9th Cir.

2    2007) ("terms in an ERISA plan should be interpreted in an ordinary and popular sense as would a

3    person of average intelligence and experience") (cleaned up). There is no ambiguity here that

4    favors Mr. Beryl. *Barnes v. Indep. Auto. Dealers Assoc. of Cal. Health & Welfare Benefit Plan*, 64

5    F.3d 1389, 1393 (9th Cir. 1995) (court "must construe ambiguities in an ERISA plan against the

6    drafter and in favor of the insured"). (The court thus does not need to consider the testimony of

7    Navient's CEO Jack Remondi, who testified that the Severance Plan was the Navient executive

8    officers' plan and that the multiplier of two thus did not apply to Mr. Beryl.[45])

9

10   **3.  Medical, Dental, and Vision Benefits**

11       Mr. Beryl asks for $72,000, which is the cash value of the medical, dental, and vision benefits

12   that he lost for twenty-four months. The court awards $54,000, the eighteen-month value.

13       The Severance Plan provides that Eligible Officers can continue to participate in insurance

14   plans: "For eighteen (18) months (or twenty-four (24) months if the Eligible Officer is the Chief

15   Executive Officer) following the Eligible Officer's Termination Date, the Eligible Officer and his or

16   her eligible dependents or survivors will be entitled to continue to participate in any medical, dental

17   and vision insurance plans generally available to the senior management of the Corporation. . . ."

18   An Eligible Officer's entitlement to insurance benefits ends if he becomes eligible for coverage

19   with a subsequent employer.[46]

20       Navient contends that the court can award only "continued plan participation" (for up to eighteen

21   months for someone who is not a CEO) because the plan does not provide for a reimbursement for

22   replacement coverage.[47] The Plan does not provide for reimbursement. But Navient did not have

23   cause to terminate Mr. Beryl, "continued participation" is no longer a viable remedy, and Navient's

24   position would leave Mr. Beryl without a remedy for Navient's withholding of benefits.

25

26   _____

     [45] Remondi Test., Ex. D. to Sullivan Decl. – ECF No. 100-1 at 45:1–46:7 (pp. 406:1–407:7).

27   [46] Trial Ex. 17, § 3.02(a), (c) – ECF 100-1 at 27–28 (pp. 3–4, Navient-LB 000446–000447).

28   [47] Opp'n – ECF No. 100 at 14.

United States District Court
Northern District of California

Normally an ERISA plaintiff is entitled to the benefits that the plan denied improperly. 29 U.S.C. § 1132(a)(1)(B) (a plan beneficiary may sue in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan"); *Filarsky v. Life Ins. Co. of N. Am.*, 391 F. Supp. 3d 928, 938 (N.D. Cal. 2019) (a claimant must prove his entitlement to benefits by a preponderance of the evidence). But here, where there is no direct recompense under ERISA § 502(a)(1)(B), the court can award equitable relief for Mr. Beryl's second claim under ERISA § 502(a)(3).

Section 502(a)(3) provides that a participant or beneficiary may bring a claim "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). In his claim under § 502(a)(3), the plaintiff cites "losses compensable under ERISA, including but not limited to loss of severance benefits."[48]

Mr. Beryl is not entitled to relief under § 502(a)(3) to the extent that the claim duplicates his claim under § 502(a)(1)(B). "A claim for relief under section (a)(1)(B) does not automatically preclude a claim under section (a)(3), especially at the pleading stage. Courts of this district have found that (a)(3) claims remain viable even when an (a)(1)(B) claim is asserted, particularly where the relief sought in connection with each claim is distinct." *Bush v. Liberty Life Assurance Co. of Bos.*, 77 F. Supp. 3d 900, 908 (N.D. Cal. 2015). But where a plaintiff simply seeks "equitable relief based on what Plaintiff contends he is owed under the Plan," the plaintiff cannot maintain a § 502(a)(3) claim in addition to a § 502(1)(B) claim. *Ehrlich v. Hartford Life & Accident Ins. Co.*, No. 20-cv-02284-JST, 2021 WL 4472845, at *5 (N.D. Cal. May 7, 2021); *see Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 959 (9th Cir. 2016), *as amended on denial of reh'g and reh'g*

---

[48] Compl. – ECF No. 1 at 12 (¶ 56) (also seeking attorney's fees and costs). Presumably those will be the subject of a different motion after entry of judgment. In any event, because ERISA § 502(g) provides an adequate remedy for attorney's fees and cost, a separate claim for attorney's fees and costs associated with investigating and prosecuting an ERISA claim does not provide a basis to maintain a claim under § 502(a)(3). *Ehrlich*, 2021 WL 4472845, at *5.

United States District Court
Northern District of California

*en banc* (Aug. 18, 2016) ("equitable relief under § 1132(a)(3) is not available if § 1132(a)(1)(B) provides an adequate remedy").

The monetary or nonmonetary character of the relief sought is not the critical issue. *See id.* at 960 ("The Supreme Court's decision in [*CIGNA Corp. v. Amara*, 563 U.S. 421 (2011)] makes it very clear that remedies such as reformation, surcharge, estoppel, and restitution are traditionally equitable remedies, and the fact that they take a monetary form does not alter this classification."). Instead, the key issue is whether the "equitable relief [is] based on what Plaintiff contends he is owed under the Plan." *Ehrlich*, 2021 WL 4472845, at *5 (holding that "the relief Plaintiff seeks as an 'equitable surcharge' is duplicative of the relief he seeks under Section 502(a)(1)(B)" because the claimed relief was based on what he is owed under the plan and the claimed losses consisted of unpaid benefits).

Here, most of Mr. Beryl's asserted entitlement to relief under claim two duplicates the relief he seeks under claim one and fails as a matter of law. But if his claim for reimbursement of the insurance benefits fails under § 502(a)(1)(B), it survives under § 502(a)(3).

Mr. Beryl calculated the lost value of his benefits as $72,000. If that is based on twenty-four months, then the per-month value is $3,000, and the eighteen-month value is $54,000. If it is based on the value up to the time he became eligible for benefits (but not more than eighteen months), then it remains $72,000. Based on the briefing, which references twenty-four months, it appears that $54,000 is the correct answer.[49] Mr. Beryl may submit a supplemental declaration within seven days if this is not the case.

### 4. Waiting-Time Penalties

Mr. Beryl asks for $33,333.33 in waiting-time penalties under California Labor § 203.[50]

Under the California Labor Code, "[i]f an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Cal. Labor Code § 201(a). "If an employer willfully fails to pay, without abatement or deduction, . . . any wages of any employee

---

[49] Mot. – ECF No. 96 at 11–12; Reply – ECF No. 101 at 11.

[50] Mot. – ECF No. 96 at 15.

who is discharged or who quits," the employee's wages continue as a penalty until paid, for up to thirty days. *Id.*; *Mamika v. Barka*, 68 Cal. App. 4th 487, 492 (1998); *see McLean v. California*, 1 Cal. 5th 615, 619 (2016) (applying rule to employees who retire). That amount here — based on Mr. Beryl's base pay of $400,000 — is $33,333.33 for thirty days of waiting-time penalties.

"Willfully" means that the employer intentionally failed or refused to pay a wage obligation. Cal. Code. Regs. tit. 8 § 13520 ("[a] willful failure to pay wages within the meaning of Labor Code Section 203 occurs when an employer intentionally fails to pay wages to an employee when those wages are due"); *Baker v. Am. Horticultural Supply, Inc.*, 186 Cal. App. 4th 1059, 1076 (2010); *Woods v. Vector Mktg. Corp.*, No. C–14–0264 EMC, 2015 WL 2453202, at *4 (N.D. Cal. May 22, 2015) (citing *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1201 (2008) ("The settled meaning of willful, as used in section 203, is that an employer has intentionally failed or refused to perform an act which was required to be done.")). The term "willful" does not require a plaintiff to show that an employer knew its obligation and then intentionally refused to act. *Baker*, 186 Cal. App. 4th at 1075 ("[t]he knowledge requirement would be difficult to prove and would encourage [employers] to remain ignorant of their obligations" if "willful" were defined to require a knowing and intentional refusal to act).

That said, a good-faith dispute that wages are due "will preclude imposition of waiting time penalties under Section 203." Cal. Code. Regs. tit. 8 § 13520. A good-faith dispute exists "when an employer presents a defense, based in law or fact which, if successful, would preclude any recovery on the part of the employee. The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist. Defenses presented which, under all the circumstances, are unsupported by any evidence, are unreasonable, or are presented in bad faith, will preclude a finding of a 'good faith dispute.'" *Id.* § 13520(a); *see Villalpando v. Exel Direct Inc.*, Case No. 12–cv–04137–JCS, 2015 WL 5179486, at *36 (N.D. Cal. Sept. 3, 2015) ("The willfulness requirement in section 203 is subject to a good faith defense under California Code of Regulations Title 8, section 13250. . . .").

Here, Mr. Beryl established at trial that Navient intentionally failed to pay him wages. The issue is whether Navient presented a good-faith defense that would preclude Mr. Beryl's recovery.

United States District Court
Northern District of California

It presented a defense: Mr. Beryl — a good founder — was not a good employee (in part because of his failure to meet deadlines and in part because of his renegotiation of salary and 2018 financial targets). Thus, it fired him.[51] But the jury rejected Navient's theory that this context established good cause to fire Mr. Beryl. That does not end the § 203 inquiry: the issue is whether Navient's defense was, "under all the circumstances, . . . unsupported by any evidence, . . . unreasonable, or . . . presented in bad faith, . . . [thus] preclud[ing] a finding of a 'good faith dispute.'" Cal. Code. Regs. tit. 8 § 13520(a).

The analysis begins with the definition of "For Cause" in the Severance Plan:

> **2.04. "<u>For Cause</u>"** means a determination by the Committee (as defined herein) that there has been a willful and continuing failure of an Eligible Officer to perform substantially his duties and responsibilities (other than as a result of Eligible Officer's death or Disability) and, if in the judgment of the Committee such willful and continuing failure may be cured by an Eligible Officer, that such failure has not been cured by an Eligible Officer within ten (10) business days after written notice of such was given to Eligible Officer by the Committee, or that Eligible Officer has committed an act of Misconduct (as defined below). For purposes of this Plan, "Misconduct" means: (a) embezzlement, fraud, conviction of a felony crime, pleading guilty or nolo contendere to a felony crime, or breach of fiduciary duty or deliberate disregard of the Corporation's Code of Business Code; (b) personal dishonesty of Eligible Officer materially injurious to the Corporation; (c) an unauthorized disclosure of any Proprietary Information; or (d) competing with the Corporation while employed by the Corporation or during the Restricted Period, in contravention of the non-competition and non-solicitation agreements substantially in the form provided in Exhibit C upon termination of employment.[52]

Because the definition of "For Cause" functions as an exclusion, the court construes the term narrowly and resolves ambiguities against the drafter, Navient. *Wise*, 478 F. Supp. 3d at 886.

When the Fiduciary Committee fired Mr. Beryl, it determined that his "actions (or failure to act) constitute a willful and continuing failure to substantially perform his duties" as Earnest's CEO and that "such actions (or failure to act) are not curable." It predicated that determination of "for cause" on Mr. Hynes's explanation that Mr. Beryl (1) "had spent significant time and

---

[51] Navient Proposed Findings of Fact – ECF No. 49-8 at 5–6 (¶¶ 4–12); *see infra* (recounting trial testimony).

[52] Trial Ex. 17, § 2.04 – ECF No. 100-1 at 26 (p. 2, Navient-LB 000445); Jury Instr. – ECF No. 81 at 13.

resources attempting to renegotiate his personal compensation and the financial targets established for Earnest, both of which had been agreed upon . . . prior to the acquisition," (2) "during this time, . . . repeatedly missed deadlines for providing a detailed 2018 business plan for Earnest," and (3) "to-date had not provided a detailed 2018 business plan for Earnest."[53]

First, as set forth in the Findings of Fact, the evidence did not support Navient's view that Mr. Beryl's performance was substandard in three ways: (1) he did not provide budget plans by November 2017 and did not project loss satisfactorily; (2) when he produced an acceptable plan on January 22, 2018, he badmouthed it; and (3) he renegotiated his salary and his non-compete agreement. As to (1) and (2), Mr. Beryl and his team worked long days to deliver budget plans that were comprehensive and apparently accurate. There were no deadlines, no communications about issues, and no opportunity to address any failure. It is inaccurate that Mr. Beryl had not provided a detailed 2018 plan. As to (3), there was no evidence that Mr. Beryl failed to perform his responsibilities by renegotiating his team's compensation package.

Second, Navient contends that Mr. Beryl — apparently by successfully renegotiating his team's compensation package — breached "his fiduciary duty to Navient Corp. and Earnest LLC by placing his own financial interests above those of the company" and "committed an act of misconduct [presumably under the Severance Plan], namely, a breach of the duties of good faith and fair dealing contained in the agreement to sell Earnest" and his employment contract.[54] The Severance Plan defines "misconduct" (e.g., a felony, embezzlement, a breach of fiduciary duty).[55] The definition does not include breaching a duty of good faith. Fiduciary duties and the duties of good faith and fair dealing are, in general, distinct concepts. For example, in *Vu v. Prudential Prop. & Cas. Ins. Co.*, the court explained that the "unequal bargaining power" that characterizes the insurer-insured relationship has led the courts to impose "special and heightened" duties, but

---

[53] Trial Ex. 9 at 1 (Navient-LB 000462); *see* Navient Proposed Findings of Fact & Conclusions of Law – ECF No. 49-8 at 5–6 (¶¶ 4–12) (Mr. Beryl spent his time renegotiating his compensation and Earnest's 2018 financial goals, missed deadlines, and placed his financial interests ahead of the company).

[54] Navient Proposed Findings of Fact & Conclusions of Law – ECF No. 49-8 at 6 (¶¶ 11–12).

[55] Trial Ex. 17, § 2.04 – ECF No. 100-1 at 26 (p. 2, Navient-LB 000445); Jury Instr. – ECF No. 81 at 13.

"[w]hile these 'special' duties are akin to, and often resemble, duties which are also owed by fiduciaries, the fiduciary-like duties arise because of the unique nature of the insurance contract, not because the insurer is a fiduciary." 26 Cal. 4th 1142, 1151 (2001); *see also New Plumbing Contractors, Inc. v. Nationwide Mut. Ins. Co.*, 7 Cal. App. 4th 1088, 1096 (1992) ("Even assuming a fiduciary-type relationship exists [between and insurer and an insured], neither the duty nor the covenant of good faith and fair dealing extend beyond the terms of the insurance contract in force between the parties.").

Given that exclusionary terms are construed narrowly, *Wise*, 478 F. Supp. 3d at 886, the breach of the duty of good faith and fair dealing is not the equivalent of the breach of a fiduciary duty. Moreover, negotiating a better compensation package — that Navient agreed to — is not a breach of the duty of good faith. At least, Navient presents no legal analysis to show that it is.

Relatedly, the existence of a fiduciary duty is a question of law, and the breach of a fiduciary duty is a question of fact. *Marzec v. Cal. Pub. Emps. Ret. Sys.*, 236 Cal. App. 4th 889, 915 (2015). Officers or directors of a wholly owned subsidiary owe a fiduciary duty to the parent corporation. *Thomas Weisel Partners LLC v. BNP Parabas*, No. C 07–6198 MHP, 2010 WL 1267744, at *5 (N.D. Cal. Apr. 1, 2010) ("[a] fiduciary of a subsidiary also owes a fiduciary duty to the subsidiary's parent corporation"); *PQ Labs, Inc. v. Qi*, No. 12–0450 CW, 2014 WL 334453, at *12 (N.D. Cal. Jan. 29, 2014) (employee owed fiduciary duty to employer, a subsidiary of parent corporation, and the parent). Mr. Beryl had a fiduciary duty to Navient Corporation as a Senior Vice President of Navient Solutions, LLC, a subsidiary of Navient Corporation. But successful negotiation of his team's compensation package is not a breach of that duty.

The evidence did suggest that Mr. Beryl's pushing for more compensation — for himself and his team — and his pushing back on budgets did not sit well with Navient, which perhaps experienced him ultimately as a bad fit. That may be a reason to fire someone. But it was not "cause" under the Severance Plan.

That does not end the inquiry: an unsuccessful defense is not necessarily inconsistent with a good-faith dispute. Cal. Code. Regs. tit. 8 § 13520(a). But there was no evidence of any breach of a fiduciary duty by Mr. Beryl or that he had a "willful and continuing failure . . . to perform

United States District Court
Northern District of California

United States District Court
Northern District of California

substantially his duties and responsibilities."[56] The undisputed evidence was that Mr. Beryl worked tirelessly and was correct in his assessment of the budget. The Severance Plan contemplated warnings and an opportunity to cure, but there was no notice of deadlines or deficiencies. This at minimum is unreasonable.

In sum, Navient did not establish its good-faith-dispute defense. Its denial of benefits under the Severance Plan defense was, "under all the circumstances, . . . unsupported by any evidence . . . [and] unreasonable, . . . which . . . preclude[s]s a finding of a 'good faith dispute.'" Cal. Code. Regs. tit. 8 § 13520(a). The court awards $33,333.33 in waiting-time penalties.

## CONCLUSION

The amounts owed to Mr. Beryl are as follows (the first three under the Severance Plan and the last under Cal. Labor Code § 203): $800,000 (a salary and annual bonus of $400,000 each and a multiplier of one), $33,333 for the target bonus for 2018, $54,000 (the eighteen-month value of lost medical, dental, and vision benefits), and $33,333.33 in waiting-time penalties under California Labor § 203. The total is $920,666.33.

If the court's math is wrong on the $54,000 for insurance benefits, Mr. Beryl must say so within seven days. Also within seven days, the parties must submit a proposed form of judgment for the jury trial and the bench trial.

**IT IS SO ORDERED.**

Dated: April 11, 2023

_____
LAUREL BEELER
United States Magistrate Judge

---

[56] Navient Proposed Findings of Fact & Conclusions of Law – ECF No. 49-8 at 5–6 (¶¶ 4–12); Trial Ex. 17, § 2.04 – ECF No. 100-1 at 26 (p. 2, Navient-LB 000445).